**DEVEX CORPORATION, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Civ. A. No. 3058.**

United States District Court,
D. of Delaware.

Aug. 8, 1983.

On Postjudgment Interest Aug. 22, 1983.

As Amended Aug. 22, 1983.

William H. Sudell, Jr., and Denison H. Hatch, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for the TeGrotenhuis and Ziesenheim plaintiffs.

Robert K. Payson, and W. Laird Stabler, III, of Potter, Anderson & Corroon, Wilmington, Del., for all other plaintiffs; Sidney Bender, and Aaron Lewittes, of Leventritt, Lewittes & Bender, Garden City, N.Y., of counsel.

Arthur G. Connolly, and Arthur G. Connolly, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for defendant; George E. Frost, of Barnes, Kisselle, Raisch, Choate, Whittemore & Hulbert, Birmingham, Mich., of counsel.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This patent litigation, which began nearly twenty-seven years ago, is now reaching a

conclusion. On May 24, 1983, the United States Supreme Court affirmed this Court's award of $11,022,854.97 prejudgment interest to the plaintiffs in this case. *See General Motors Corp. v. Devex Corp.,* —— U.S. ——, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), *aff'g.,* 667 F.2d 347 (3d Cir.1981), *aff'g.,* 494 F.Supp. 1369 (D.Del.1980). On June 6, 1983, General Motors deposited the $11,022,854.97 in prejudgment interest with the Court. Subsequently, this Court directed the Clerk of the Court to deposit the $11,022,854.97 in an interest bearing account with the Delaware Trust Company. Currently before the Court are the cross-motions of the various plaintiffs concerning the distribution of this money.

There are several plaintiffs in this case, and it is necessary to provide some background information concerning each plaintiff's role in this litigation to explicate properly the issues presently before the Court. The patent involved in this case is Reissue Patent No. 24,017 (hereinafter "Henricks Patent") issued to John A. Henricks, President of Devex Corporation, on June 7, 1955, on Original Patent No. 2,588,234, dated March 4, 1952.[1] Subsequently, the Henricks Patent was assigned by Devex Corporation (hereinafter "Devex"), and Henricks to William M. McCoy, Theodore A. TeGrotenhuis, and Frederick B. Ziesenheim.[2] These three individuals were attorneys, each involved in prosecuting infringement claims concerning the Henricks Patent.

In 1964, McCoy, TeGrotenhuis, and Ziesenheim (hereinafter referred to as "Licensors"), entered into an exclusive License Agreement with Technograph, Inc. (hereinafter "Technograph"), a North Carolina corporation, concerning the Henricks Patent.[3] The License Agreement vested Technograph with all significant rights in the Henricks Patent, with the Licensors retaining only bare legal title.[4] The 1964 License Agreement provided, *inter alia,* that Technograph would pay the Licensors $6,000,000 from monies received through sublicense agreements and infringement suit judgments or settlements relating to the Henricks Patent.[5]

As a result of the final judgment entered by United States Court of Appeals for the Third Circuit on certain portions of this case,[6] this Court, in July, 1982, distributed $8,813,945.50 [7] to the Technograph/GM Fund (hereinafter referred to as the "Fund").[8] Out of the Fund, Technograph paid priority claims in accordance with the Modification and Restatement of Agreement of Exclusive License to Technograph, Inc., dated January 31, 1977 (hereinafter "1977 Agreement") (Dkt. Item 691, Exhibit A).[9] *See* Letter of Sidney Bender, Esq. to Licensors (July 30, 1982) (Dkt. Item 691, Exhibit C). After these priority claims were satisfied, Technograph distributed $3,801,794.27 out of the Fund to the Licensors, and the remainder was paid out to Technograph.[10] These distributions were

---

1. *See Devex Corp. v. General Motors Corp.,* 494 F.Supp. 1369, 1371 n. 1 (D.Del.1980).

2. *See* 1964 License Agreement at 1 (December 21, 1964). The original assignment was made only to McCoy and TeGrotenhuis. *See* 1955 Assignment Agreement at 1 (September 10, 1955). Exactly how Ziesenheim acquired his interest is not clear from the current record.

3. *See* 1964 License Agreement at 1 (December 21, 1964). This Agreement was subsequently modified, most significantly on January 31, 1977. *See* Exhibit A to Dkt. Item 691.

4. *See Devex Corp. v. General Motors Corp.,* 316 F.Supp. 1376, 1380 (D.Del.1970), *rev'd.,* 467 F.2d 257 (3d Cir.1972) *cert. denied,* 411 U.S. 973, 93 S.Ct. 2145, 36 L.Ed.2d 696 (1973).

5. *See* 1964 License Agreement, Art. 2, 3 at pp. 2–3.

6. *See Devex Corp. v. General Motors Corp.,* 667 F.2d 347 (3d Cir.1981).

7. The amount constitutes the royalty award in this case.

8. The Fund was created as part of the 1964 License Agreement. *See* 1964 License Agreement at Art. 2, 3. The purpose of the Fund and its impact on the instant controversy will be discussed in more detail, *infra.*

9. The 1977 Agreement, in substance, is very similar to the original License Agreement entered into in 1964. It is the 1977 Agreement, however, that is presently at issue.

10. Technograph received approximately $900,000. Letter of Sidney Bender, Esq. to William H. Sudell, Jr., Esq. at 2 (March 10, 1983) (Dkt. Item 695, Attachment).

also made in accordance with the 1977 Agreement. *See* Letter of Sidney Bender, Esq. to Licensors at 2 (July 30, 1982) (Dkt. Item 691, Exhibit C). After these distributions, the Licensors collectively were entitled to an additional $2,001,245.73 under the terms of the 1977 Agreement. Consequently, McCoy,[11] TeGrotenhuis,[12] and Ziesenheim[13] were each entitled to an additional $667,081.91 each, if and when additional money was received as a result of this litigation.

On January 31, 1983, the McCoy Group entered into an agreement with Technograph in which they assigned all their interests in the Henricks Patent to Technograph in exchange for Technograph promissory notes totaling $667,081.91.[14] At approximately the same time, Technograph also made efforts to acquire the TeGrotenhuis Group's interest in the Henricks Patent, and a portion of the Ziesenheim Group's interest.

As previously stated, on June 6, 1983, General Motors deposited $11,022,854.97 with this Court to satisfy its prejudgment interest liability to the plaintiffs. On June 14, 1983, Technograph filed a motion seeking to transfer these monies to the Technograph/GM Fund. By the papers Technograph has filed in connection with that motion, and in statements made to the Court by its counsel, it is apparent that Technograph does not intend to distribute the full amount owed to the TeGrotenhuis and Ziesenheim Groups under the 1977 Agreement. Technograph, however, maintains that it al-

ready has paid the TeGrotenhuis Group the $667,081.91 due under the 1977 Agreement. As such, Technograph claims that the TeGrotenhuis Group is not entitled to any additional money. Technograph further maintains that it has paid the Ziesenheim Group $133,416.39 of the $667,081.91 that is due. Consequently, Technograph claims that it must pay out only an additional $533,665.52 to the Ziesenheim Group.

The TeGrotenhuis and Ziesenheim Groups have opposed Technograph's motion for the transfer of funds. These two groups contend that Technograph has not paid them any portion of the $667,081.91 due under the 1977 Agreement. As such, the two groups have filed their own motions for the transfer of funds. This motion seeks an order transferring the prejudgment interest account at the Delaware Trust Company to the Technograph/GM Fund, with specific instructions that Technograph thereafter distribute $667,081.91 to both groups as required under the 1977 Agreement. The issue for the Court to decide is the amount of money to be distributed to each plaintiff from the $11,022,854.57 that is in the Court's possession.

The facts surrounding the current controversy are not in dispute. The parties agree that after the various distributions were made in July, 1982, there remained a contingent obligation to pay the TeGrotenhuis and Ziesenheim Groups an additional $667,081.91 each, representing the balance of the purchase price due under the 1977 Agree-

**11.** At this time, William C. McCoy is dead. His interest as Licensor is controlled by his son, William C. McCoy, Jr., for himself, as attorney-in-fact for John F. Fant, Jr., and as Trustee under the Will of William C. McCoy on behalf of the lineal descendents of William C. McCoy, Jr., John F. Fant, Jr., Katherine M. Bassett, and the lineal descendents of Katherine M. Bassett. *See* Letter of William C. McCoy, Jr. to the Court (June 24, 1983). These individuals hereinafter will be referred to as the "McCoy Group."

**12.** Part of Theodore A. TeGrotenhuis' interest has been transferred to his wife individually and as Trustee for their children. *See* TeGrotenhuis and Ziesenheim Plaintiffs' Opening Brief at 6 n. 1. These individuals hereinafter

will be referred to as the "TeGrotenhuis Group."

**13.** Part of Frederick B. Ziesenheim's interest has been transferred to other parties. These new parties include the estate of Walter J. Blenko (represented by Don B. Blenko and Walter J. Blenko, Jr.), Eugene F. Buell, John H.F. Leonard (since deceased, his interest is now owned by his widow, Martha O. Leonard), and Walter J. Blenko, Jr. *See* TeGrotenhuis and Ziesenheim Plaintiffs' Opening Brief at 6 n. 2. These individuals hereinafter will be referred to as the "Ziesenheim Group."

**14.** *See* Assignment and Receipt between McCoy Group and Technograph (January 31, 1983) (attached to Letter of William C. McCoy, Jr. to the Court, June 17, 1983).

ment. As previously stated, this obligation was conditional upon additional amounts of money being received and deposited into the Technograph/GM Fund.[15]

In early 1983, Technograph became interested in acquiring the Licensors' rights in the Henricks Patent.[16] To this end, Technograph contacted each of the three groups of Licensors in an effort to purchase their interests. As previously set forth, Technograph reached an agreement with the McCoy Group, and acquired that Group's interest on January 31, 1983.[17]

With respect to negotiations with the TeGrotenhuis Group, Technograph, by letter dated February 18, 1983, offered to pay the TeGrotenhuis Group $667,081.91 in return for their assignments and release of their interest in the Henricks Patent to Technograph. (Dkt. Item 695, Attachment). On February 21, 1983, Mr. TeGrotenhuis refused to execute such a document.[18] Nevertheless, despite TeGrotenhuis' refusal, Technograph created two accounts at the Delaware Trust Company on behalf of Mr. and Mrs. TeGrotenhuis in the total amount of $667,081.92.[19]

Upon being advised of the creation of these two accounts, Mr. TeGrotenhuis wrote to Sidney Bender, Esq. of Technograph on February 28, 1983. The letter reads in relevant part:

> My wife, Marjorie, and I both thank you very much for Technograph's deposit of $333,540.96 to each of our respective accounts in the Delaware Trust Company.
>
> I have applied $41,000 of the deposit to my bill for services.
>
> Both Marjorie and I shall expect the balance due us from Technograph soon after the Supreme Court renders its decision.

Letter of Theodore A. TeGrotenhuis to Sidney Bender, Esq. (February 28, 1983) (Dkt. Item 695, Attachment).

In a letter to Mr. TeGrotenhuis dated March 10, 1983, Bender advised TeGrotenhuis that Technograph did not recognize his claim for $41,000. (Dkt. Item 695, Attachment). In a letter of the same date to William H. Sudell, Jr., Esq., the TeGrotenhuis Group's attorney, Bender further claimed that through the creation of the two bank accounts, Technograph had acquired all the TeGrotenhuis Group's interest in the Henricks Patent. See Letter of Sidney Bender, Esq. to William H. Sudell, Jr., Esq., at 1 (March 10, 1983) (Dkt. Item 695, Attachment). The TeGrotenhuis Group, however, maintained that Technograph had not acquired their interest in the Henricks Patent. See Letter of William H. Sudell, Jr., Esq., to Sidney Bender, Esq. at 1 (March 30, 1983) (Dkt. Item 695, Attachment).

With respect to negotiations with the Ziesenheim Group, Technograph had on-going negotiations with Walter J. Blenko, Jr. in an effort to acquire that Group's interest in the Henricks Patent. On February 16, 1983, Technograph sent the Ziesenheim Group a letter, along with an agreement which for $667,081.91 would assign the Group's interest in the Henricks Patent over to Technograph. (Dkt. Item 695, Attachment). Technograph's offer, however, was not accepted.[20] Nevertheless, on February 28, 1983, Technograph tendered a check to Frederick B. Ziesenheim as Trustee for Martha O. Leonard,[21] in order to obtain Leonard's interest in the Henricks Patent. See Letter of Sidney Bender, Esq. to William H. Sudell, Jr., Esq., at 2 (March 10, 1983) (Dkt. Item 695, Attachment). The check was for $133,416.39, representing

---

**15.** Technograph Brief at 4, see pp. 1356–1357, supra.

**16.** It appears that Technograph needed to expend money for tax purposes. Consequently, this appears to be the reason why Technograph desired to obtain the Licensors' interests in the Henricks Patent.

**17.** See footnote 14, supra, and accompanying text.

**18.** Technograph Brief at 4.

**19.** Each account was for $333,540.96, one for Mr. TeGrotenhuis individually and one for Mrs. TeGrotenhuis individually and as Trustee for the TeGrotenhuis children. Technograph Brief at 5. The payment exceeded the contract price by one cent.

**20.** See Technograph Brief at 21.

**21.** Mrs. Leonard is a member of the Ziesenheim Group. See footnote 13, supra.

Leonard's ⅕ share in the Ziesenheim Group's total interest of $667,081.91. *See id.*

On March 3, 1983, Frederick B. Ziesenheim returned the check proffered for the benefit of Martha Leonard, stating that he could not accept payment on her behalf to the exclusion of the other beneficiaries of the Trust.[22] *See* Letter of Frederick B. Ziesenheim to Sidney Bender, Esq. at 1 (March 3, 1983) (Dkt. Item 695, Attachment). Ziesenheim did inform Bender, however, that he would accept payment tendered to the Trust beneficiaries as a whole. *Id.*

Despite these communications, on March 8, 1983, Technograph established an account for $133,416.39 at the Delaware Trust Company for the benefit of Frederick B. Ziesenheim as Trustee for Martha O. Leonard.[23] Based on the creation of this account, Technograph maintained that it had obtained Leonard's interest in the Henricks Patent. *See* Letter of Sidney Bender, Esq. to William H. Sudell, Jr., Esq., (March 10, 1983) (Dkt. Item 695, Attachment). Technograph maintained this position even though no one on behalf of the Ziesenheim Group touched the funds,[24] and that the Group further informed Technograph that it did not recognize Technograph's acquisition of the Leonard interest. *See* Letter of William H. Sudell, Jr., Esq. to Sidney Bender, Esq., at 2 (March 30, 1983) (Dkt. Item 695, Attachment).

Based on the foregoing facts, Technograph contends that the TeGrotenhuis Group is not entitled to any additional money under the 1977 Agreement because they already were paid the requisite $667,091.91. Technograph further maintains that the

Ziesenheim Group is entitled to only an additional $533,665.52 because it has paid for Leonard's interest in the amount of $133,416.39. The TeGrotenhuis and Ziesenheim Groups contend that the actions by Technograph did not constitute proper payment under the 1977 Agreement. Consequently, the TeGrotenhuis and Ziesenheim Groups argue that they are still entitled to the full $667,081.91 owed them pursuant to the 1977 Agreement.[25]

Technograph essentially makes two arguments in support of its position that the TeGrotenhuis and Ziesenheim Groups properly were paid in accordance with the 1977 Agreement. First, Technograph contends that under the 1977 Agreement, it was allowed to make payments to the Licensors at any time. Consequently, Technograph maintains that the debt was satisfied because the Licensors could not refuse to accept the payments that Technograph made. Alternatively, Technograph contends that even if the tendered payments were not made in accordance with the 1977 Agreement, the subsequent actions of the TeGrotenhuis and Ziesenheim Groups constituted an acceptance of the tendered payments, and therefore there was at least an implied modification of the 1977 Agreement. The Court will address these contentions *seriatim.* There is, however, a preliminary issue of the Court's jurisdiction to hear this controversy that first must be resolved.

The issues raised concerning the distribution of the prejudgment interest account are not related to the underlying patent infringement suit upon which this Court's jurisdiction was initially founded. Consequently, because a federal court is one of limited jurisdiction, the Court *sua sponte*

---

**22.** It is not entirely clear from the record who the other beneficiaries of the trust are, although it appears likely that they are the other members of the Zienseheim Group. *See* footnote 13, *supra.*

**23.** Technograph Brief at 12.

**24.** *See* Ziesenheim Affidavit ¶ 18 (Dkt. Item 690).

**25.** The TeGrotenhuis and Ziesenheim Groups desire payment in strict accordance with the 1977 Agreement so that all money received will

be afforded capital gains tax treatment, rather than being treated as ordinary income. *See* TeGrotenhuis and Ziesenheim Plaintiffs' Opening Brief at 4. Technograph refuses to take back the money it contends was paid to the TeGrotenhuis and Ziesenheim Groups because it will adversely affect Technograph's tax position. *See* Technograph Brief at 10. Consequently, this entire controversy centers around each parties attempt to minimize their tax liability on money received from this litigation.

raised the issue of whether this Court was a proper forum to resolve the current dispute amongst the plaintiffs. After a review of the case law, however, the Court is satisfied that it does have jurisdiction to decide this matter.

The basis for the Court's authority to resolve the current controversy is this Court's ancillary jurisdiction. In *Oklahoma v. Texas,* 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922), the Supreme Court held as follows:

It long has been settled that claims to property or funds of which a court has taken possession and control . . . may be dealt with as ancillary to the suit wherein possession is taken and the control exercised, and this although independent suits to enforce the claims could not be entertained in that court.

258 U.S. at 581, 42 S.Ct. at 409; *see Freeman v. Howe,* 65 U.S. (24 How.) 450, 460, 16 L.Ed. 749 (1860). Consequently, it appears that this Court has the authority to determine the proper distribution of the funds that are currently in its possession.

■ The perimeters of ancillary jurisdiction of this type were outlined in *Grimes v. Chrysler Motors Corp.,* 565 F.2d 841 (2d Cir.1977) (per curiam). In *Grimes,* the underlying cause of action was a personal injury claim, with federal jurisdiction predicated upon diversity of citizenship. The case was settled before completion of trial, and the settlement funds were deposited in the district court's registry. Subsequently, a dispute arose amongst the plaintiffs' attorneys concerning the amount to which

each was entitled to out of the settlement fund. The district court proceeded to resolve the dispute between the non-party attorneys in order to make a proper distribution of the settlement fund. In affirming the district court's exercise of jurisdiction over this dispute, the United States Court of Appeals for the Second Circuit stated the following:

Although the exact jurisdictional question involved in this suit rarely arises, there is ample authority to support the general proposition that a district court acquires jurisdiction as an entirety, and may, as an incident to the disposition of the matter properly before it, possess jurisdiction to decide other matters raised by the case of which it could not take cognizance were they independently presented. The Supreme Court has established that the exercise of ancillary jurisdiction is appropriate where the subsidiary controversy has direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit. Under these standards, the District Court's distribution of the *Grimes* settlement funds and its determination of appropriate disbursements was clearly ancillary to its approval of the settlement of the case.

565 F.2d at 844 (internal citations and quotations omitted). The present controversy clearly falls within the jurisdictional boundaries set forth in *Grimes.* Consequently, the Court concludes that it has ancillary jurisdiction to make an appropriate distribution of the funds currently in its possession.[26]

---

**26.** Technograph argues that the Court only has ancillary jurisdiction to order the payment of the money into the Technograph/GM Fund, but not to resolve the amount each plaintiff is entitled to out of the Fund. Technograph Brief at 20–22. This argument is without merit. The primary purpose of an exercise of ancillary jurisdiction of this type is to allow parties with claims to property in the court's possession to be heard. *See* 13 Wright, Miller, Cooper, *Federal Practice & Procedure,* § 3523 at 59 (1975). If a party presents a valid claim, the court then should order an "appropriate disbursement" of the property in its possession. *Grimes,* 565 F.2d at 844. Consequently, to accept Technograph's position that the Court can only distribute the money within the Technograph/GM

Fund, but not to determine the amount each plaintiff is entitled to, would frustrate the very reason for this Court's exercise of ancillary jurisdiction.

The Court also notes that the TeGrotenhuis and Ziesenheim Groups have filed cross-claims against Technograph pursuant to Fed.R.Civ.P. 13(g) concerning the distribution of the prejudgment interest account. At this time, Technograph has not responded to the cross-claims and therefore it is not settled whether the cross-claims are proper, or whether they provide the Court with a second basis for jurisdiction. Rule 13(g) allows for cross-claims when such claims arise "out of a transaction or occurrence that is the subject matter of the original action. The rule also has been applied to

Having resolved the question of jurisdiction, the Court must now turn to the merits of the controversy. As previously stated, Technograph's first argument is that the payments made to the TeGrotenhuis and Ziesenheim Groups were effective and proper under the 1977 Agreement because that. Agreement allowed Technograph to make payments to the Licensors at any time it desired. Article 2 of the 1977 Agreement, however, limits Technograph's source of money for payment to the Licensors. Article 2 provides in relevant part:

> The purchase price for the license granted herein is Five Million, Eight Hundred Three Thousand Forty ($5,803,040) Dollars,[27] *payable only out of the General Motors Fund* ("GM Fund") specified in Article 3, which GM Fund Technograph shall attempt to create and enlarge by taking full control over the direction and management of the litigation entitled Devex Corporation, et al., plaintiffs against General Motors Corporation. . . .

1977 Agreement, Art. 2 at 2–3 (Dkt. Item 691, Exhibit A) (emphasis added). The GM Fund referred to is the Technograph/GM Fund, which consists of "all amounts received as a result of any settlement or judgment from the GM litigation." *Id.,* Art. 3, ¶ A at 3. Article 3 further provides that after priority payments are made, that the Licensors were to receive 80% of all money paid into the Fund until the full purchase price of $5,803,040 was paid. *Id.,* Art. 3, ¶ (B)(5)(a) at 5.

Article 2 and Article 3 of the 1977 Agreement clearly indicate that the TeGrotenhuis and Ziesenheim Groups were to be paid the $667,081.91 balance due only out of the Technograph/GM Fund, as money was paid into that Fund. The payments tendered to these plaintiffs, however, came not from the Fund but from Technograph's personal assets.[28] Money could not have been tendered from the Fund in February 1983, because there was no money in the Fund at that time. Consequently, the Court finds that the payments made by Technograph were not in accord with the 1977 Agreement.[29]

Technograph alternatively argues .that even if payment was not proper under the 1977 Agreement, the TeGrotenhuis and Ziesenheim Groups accepted the tendered payments made outside the terms of the Agreement, and hence the 1977 Agreement was implicitly modified. The Court will now review this second contention of Technograph.

First, the Court finds that Technograph tendered the money to the TeGrotenhuis and Ziesenheim Groups in an effort to acquire the TeGrotenhuis Group's and Martha

provide jurisdiction when the subject matter of the cross-claim provides the court with an independent basis of jurisdiction. *See Pierce v. Perlite Aggregates, Inc.,* 110 F.Supp. 684, 688 (N.D.Cal.1952); *see also Tycom Corp. v. Redactron Corp.,* 421 F.Supp. 460, 463 (D.Del. 1976). In this case, it appears that there is complete diversity of citizenship between the TeGrotenhuis/Ziesenheim Groups and Technograph, and that more than $10,000 is in controversy. (Dkt. Item 699, ¶¶ 1–4; Dkt. Item 700, ¶¶ 1–4). Consequently, the cross-claims could have been brought as original complaints pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). In such a circumstance, it appears the Court can treat the cross-claims as original complaints for purposes of jurisdiction. *Pierce,* 110 F.Supp. at 688. Consequently, these cross-claims may well afford the Court with an additional basis for jurisdiction, irrespective of this Court's ancillary jurisdiction.

**27.** This figure represents an adjustment from the original $6,000,000 purchase price. *See* footnote 5 and accompanying text, *supra.*

**28.** The source of the money was the $900,000 disbursed to Technograph in July, 1982. *See* Technograph Brief at 5; *see also* footnote 10, *supra.*

**29.** Technograph's only argument against this conclusion is that the limitation to the Fund as a source of payment was a condition solely for Technograph's benefit, a condition which it could waive. Technograph Brief at 24. There is nothing in the 1977 Agreement that would indicate that Article 2 was solely for Technograph's benefit, or that the source of payment clause could be waived. Indeed, the TeGrotenhuis and Ziesenheim Groups steadfastly contend that the source of payment requirement was necessary for the Licensors to receive capital gains tax treatment on any money received from this lawsuit. Ziesenheim Affidavit ¶ 3 (Dkt. Item 690); TeGrotenhuis Affidavit ¶ 2 (Dkt. Item 691). Consequently, the Court cannot accept Technograph's unsupported contention that the Licensors cannot enforce a clearly delineated term of the contract.

Leonard's interest in the Henricks Patent. This conclusion is amply supported by the record. Technograph's payments came at a time when it was attempting to acquire all the Licensors' interests in the Henricks Patent. To this end, Technograph sent contracts to all three groups of Licensors that if agreed to would have assigned their interests in the Henricks Patent to Technograph.[30] Although the McCoy Group signed this Agreement,[31] neither the TeGrotenhuis nor the Ziesenheim Group entered into such an Agreement.

A letter by Sidney Bender, Esq., an officer of Technograph, conclusively establishes that the payments were made as an offer to acquire the TeGrotenhuis and Leonard interests in the Henricks Patent. As it pertains to the TeGrotenhuis Group's interest, this letter reads in pertinent part:

> Technograph on February 22, 1983 acquired from Theodore A. TeGrotenhuis and Marjorie T. TeGrotenhuis, individually and as Trustee for Neil A., David Allen and Lynn Ann TeGrotenhuis, all their right, title and interest in and to U.S. Patent RE24,017 and Canadian Patent 513,854 and in and to the GM Fund as then or in the future constituted and in the License, including without limitation the judgment or any future judgment against General Motors Corporation entered in the United States District Court for the District of Delaware (Civil Action No. 3058) and on review by the Supreme Court of the United States by the payment to Theodore A. TeGrotenhuis of $333,540.96 and of the same amount to Marjorie E. TeGrotenhuis, individually and as Trustee in full payment of their ⅓ rd interest in the license (as that interest is defined in the License Agreement which was modified and restated on January 31, 1977). As shown by the attached

letter dated July 30, 1982 to, inter alia, Theodore A. TeGrotenhuis and Marjorie E. TeGrotenhuis, individually and as Trustee from the undersigned, the balance of the purchase price due to the patent owners was $2,001,245.73. The TeGrotenhuis's owned a ⅓rd interest in that amount if and when collected in the GM Fund. Technograph elected to prepay the TeGrotenhuis share of the purchase price in the total amount of $667,081.92 by depositing the same for the benefit of each in the Delaware Trust Company, as shown by the attached letter of February 22, 1983 from Technograph to Delaware Trust Company.

Letter of Sidney Bender, Esq. to William H. Sudell, Jr., Esq., at 1 (March 10, 1983) (Dkt. Item 695, Attachment). As it pertains to Martha O. Leonard's interest, the letter reads in pertinent part:

> Furthermore, on February 28, 1983, by the payment of a check in the amount of $133,416.39 payable to Frederick B. Ziesenheim as Trustee for Martha D. Leonard [sic], Technograph acquired all of Mrs. Leonard's right, title and interest in the license, that being the balance of the purchase price for Mrs. Leonard's ⅟₁₅th interest of the $2,001,245.73 payable only out of the GM Fund pursuant to the Agreement. Inasmuch as Mr. Ziesenheim on Mrs. Leonard's behalf rejected that check for payment, Technograph thereafter delivered said sum of $133,416.39 to Delaware Trust Company for the benefit of Frederick B. Ziesenheim, Trustee for Martha D. Leonard (Account No. 7060572).

*Id.* at 2. These statements unequivocally demonstrate that the money Technograph tendered was in fact an offer to purchase the TeGrotenhuis and Leonard interests in the Henricks Patent.[32]

---

**30.** *See* footnote 14, and accompanying text, *supra;* TeGrotenhuis Affidavit, Exhibit I (Dkt. Item 691); *Letter of Sidney Bender, Esq. to Walter J. Blenko, Jr., Esq.* (February 16, 1983) (Dkt. Item 695, Attachment).

**31.** *See* footnote 14 and accompanying text, *supra.*

**32.** Technograph, in its brief, has not disputed that the offer was made in an effort to acquire

the TeGrotenhuis and Leonard interests. It would be impossible for Technograph to argue that the money was not tendered for such a purpose. At the time Technograph tendered the money, Technograph did not owe either the TeGrotenhuis or the Ziesenheim Groups any money under the terms of the 1977 Agreement. Technograph was required to pay these parties only if additional money was paid into the Technograph/GM Fund. 1977 Agreement, Art.

Technograph, of course, did not acquire the TeGrotenhuis and Leonard interests simply by making offers to the respective parties. Acceptances also must have been made before an implied modification of the 1977 Agreement took place. The applicable law in this area is as follows:

> The acceptance, to be effective, must be unequivocal and unconditional, and it may not introduce additional terms and conditions. If a condition is affixed to the acceptance by the party to whom the offer is made, or any modification of or change in the offer is made or requested, there is a rejection of the offer which puts an end to the negotiation, unless the party who made the original offer renews it or assents to the modification suggested. The effect of an acceptance containing conditions not found in the offer is to make a counterproposal, upon which the parties have not yet agreed, but which is open for acceptance or rejection. A qualified acceptance is simply a counteroffer....

17 Am.Jur.2d *Contracts* § 62 at 401 (1964) (citations omitted); *see Roer v. Cross County Medical Center Corp.*, 83 A.D.2d 861, 441 N.Y.S.2d 844 (1981);[33] *Restatement (Second) Contracts* § 59 at 145–147 (1981). Under this legal standard, it is certain that neither the TeGrotenhuis nor the Ziesenheim Group accepted the Technograph offer.

Upon being advised that Technograph had created two bank accounts on behalf of himself and his wife, Theodore TeGrotenhuis wrote to Bender of Technograph, thanking him for the money and stating that he expected additional money after the Supreme Court rendered its deci-sion.[34] Technograph contends that this letter constituted an acceptance of "the accounts".[35] Assuming *arguendo* that this was an acceptance of "the accounts", such acceptance is irrelevant because TeGrotenhuis was not free to "accept what was not offered."[36] *Gram v. Mutual Life Ins. Co. of New York*, 300 N.Y. 375, 91 N.E.2d 307, 311 (1950). As previously stated, the accounts were established as an offer to acquire the TeGrotenhuis' interest in the Henricks Patent. The TeGrotenhuis Group was offered $667,091.92 for that interest, an offer which they could accept or refuse, but not modify. *See id.* (fundamental rule of contract law that acceptance must comply with terms of offer). When TeGrotenhuis responded to the offer by seeking at least an additional $41,000,[37] this was a counteroffer which constituted a rejection of the initial offer. *See Roer v. Cross County Medical Center Corp.*, 83 A.D.2d 861, 441 N.Y.S.2d 844 (1981).

Consequently, as of February 28, 1983, the TeGrotenhuis Group effectively made Technograph a counteroffer. Technograph, however, unequivocally rejected the counteroffer. In a letter dated March 10, 1983,

2, 3 at 2–5 (Dkt. Item 691, Exhibit A). In February, 1983, there was no money in the Fund, and it was unsettled whether additional money would be paid in. *See* Technograph Brief at 31–32. Therefore, if the tendered payments were not made for the purpose of acquiring the TeGrotenhuis and Leonard interests, the payments would amount to a gift because Technograph was not obliged to pay the money and there was no reciprocating consideration on the part of the Licensors. Consequently, the tendered payments must be viewed as offers to acquire the interests in the Henricks Patent of the TeGrotenhuis Group and Leonard.

33. Article 8 of the 1977 Agreement provides that all questions of law concerning the Agreement shall be determined by the law of the State of New York. Consequently, New York law will be referred to in the resolution of this matter.

34. *See* Letter of Theodore A. TeGrotenhuis to Sidney Bender, Esq. (February 28, 1983) (Dkt. Item 695, Attachment). The relevant portion of this letter is set forth on page 1358, *supra*.

35. Technograph Brief at 29.

36. It is also unclear what, if any, authority Mr. TeGrotenhuis had to bind Mrs. TeGrotenhuis to the offer. The Court need not address this issue, however, because the case will be resolved on other grounds.

37. It appears that TeGrotenhuis also was preserving claims to other money he believed he was entitled to as a Licensor. *See* Letter of William H. Sudell, Jr., Esq. to Sidney Bender, Esq. at 1–2 (March 30, 1983) (Dkt. Item 695, Attachment).

Technograph responded to TeGrotenhuis' letter as follows:

> Regarding your letter of February 28, 1983, Technograph does not recognize your attempt to apply $41,000 of the money on deposit for you at Delaware Trust Company as a part payment against your claim in the amount of $41,000....
>
> Technograph does not recognize that there is any balance now owed or payable in the future to you or Marjorie.

Letter of Sidney Bender, Esq. to Theodore A. TeGrotenhuis, Esq., (March 10, 1983 (Dkt. Item 695, Attachment). A second Technograph letter of March 10, 1983 to TeGrotenhuis' attorney, in which Technograph claimed to have acquired the TeGrotenhuis' interest for $667,091.92, further evidences that Technograph rejected the counteroffer. Letter of Sidney Bender, Esq. to William H. Sudell, Jr., Esq. at 1 (March 10, 1983) (Dkt. Item 695, Attachment). Consequently, the Court finds that Technograph rejected the TeGrotenhuis counteroffer.

■ At this juncture, no further negotiations occurred. Technograph claimed that it had acquired the TeGrotenhuis' interest, and the TeGrotenhuis Group clearly disputed that claim. *See* Letter of William H. Sudell, Jr., Esq. to Sidney Bender, Esq. at 1 (March 30, 1983) (Dkt. Item 695, Attachment). Consequently, the parties had not reached an agreement concerning the acquisition of the TeGrotenhuis Group's interest. This being the case, the parties did not modify the terms of payment under the 1977 Agreement. Therefore, the 1977 Agreement must be adhered to with respect to the TeGrotenhuis Group in distributing the $11,022,854.97 in prejudgment interest.

■ With respect to the Ziesenheim Group, the rejection of the Technograph offer is even clearer. As previously set forth in the explication of the facts in this case,[38] Technograph offered the Ziesenheim Group $667,081.91 for their interest, but that offer was rejected. After this occurred, Technograph tendered a check to Frederick B. Ziesenheim in the amount of $133,416.39 in an effort to acquire Martha O. Leonard's interest in the Henricks Patent. Ziesenheim returned the check, stating he could not accept payment on behalf of Mrs. Leonard to the exclusion of others. Nevertheless, after this express rejection, Technograph established an account of $133,416.39 at the Delaware Trust Company for the benefit of Frederick B. Ziesenheim as Trustee for Martha O. Leonard. No one from the Ziesenheim Group, however, has ever touched these funds.[39]

■ Based on these facts, the Court concludes that the Ziesenheim Group *did not accept the tender of the $133,416.39*,[40] and clearly did not assent to Technograph's offer to acquire the Leonard interest. *See* Letter of William H. Sudell, Jr., Esq. to Sidney Bender, Esq. at 2 (March 30, 1983) (Dkt. Item 695, Attachment). Consequently, there was no modification of the 1977 Agreement with respect to the Ziesenheim Group. Therefore, the 1977 Agreement also must be adhered to with respect to the Ziesenheim Group in distributing the $11,022,854.97 in prejudgment interest.

■ Furthermore, accepting all of Technograph's legal conclusions concerning the propriety of the payments from Technograph to the Licensors, the Court must still find that the 1977 Agreement was not modified so as to alter the terms of payment. Article 6, ¶ A of the 1977 Agreement provides:

> This Agreement may not be modified or terminated except by writing signed by the party to be charged.

The undisputed facts show that there was no written agreement, signed by the parties, modifying the 1977 Agreement. With-

---

**38.** *See* p. 1359, *supra*.

**39.** *See* Ziesenheim Affidavit ¶ 18 (Dkt. Item 690).

**40.** Technograph contends that the March 30, 1983 letter of William H. Sudell, Jr., Esq., the Ziesenheim Group's attorney, implied that the money had been accepted. Technograph Brief at 31. The Court does not find the letter to constitute an acceptance, especially in light of later letters from the Ziesenheim Group to Technograph. *See* Technograph Brief at 13–15 (and letters referred to therein).

out such a writing, there could be no modification because of Article 6, ¶ A. Consequently, even if the correspondence established an understanding between the parties that the 1977 Agreement was to be modified, this understanding was without significance unless incorporated in a written document signed by all the necessary parties. Consequently, the failure of Technograph to obtain the requisite written agreement is an independent reason why the Court must reject the contention that the 1977 Agreement was modified.

■ In conclusion, the Court finds that the 1977 Agreement governs the distribution of the prejudgment interest account.[41] An appropriate order will issue distributing the $11,022,854.97, currently on account at the Delaware Trust Company, in accordance with this Opinion and the 1977 Agreement.

## ON POSTJUDGMENT INTEREST

As it has so frequently in the past, this patent case once again demands the Court's attention. After nearly twenty-seven years of this litigation, one would think there would be nothing left to decide. Important issues, however, remain to be resolved. On October 6, 1980, this Court entered an Order in this action which provided, *inter alia:*

   5. Defendant General Motors Corporation shall pay to plaintiff:

      (i) $8,813,945.50 plus pre-judgment interest in the amount of $10,912,291.05 (which represents interest through August 31, 1980) totalling $19,726.236.55; plus pre-judgment interest of $3,071.22 for each day thereafter up to and including the date of entry of this judgment;

      (ii) plus post-judgment interest from the date of entry of this judgment at the rate allowed by State law as provided by 28 U.S.C. § 1961.

All aspects of this Court's Order were affirmed on appeal. *See Devex Corp. v. General Motors Corp.,* 667 F.2d 347 (3d Cir. 1981), *aff'd.,* —— U.S. ——, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). General Motors paid the royalty award of $8,813,945.50 on July 7, 1982, and the pre-judgment interest award of $11,022,854.97 [1] on June 6, 1983. Consequently, the Court must now resolve two issues. First, the Court must determine the proper rate of post-judgment interest as provided for in Paragraph 5(ii) of the October 6, 1980 Order. Second, the Court must decide whether the plaintiffs are entitled to damages for delay in the payment of post-judgment interest. These issues will be addressed *seriatim.*

28 U.S.C. § 1961 governs the rate of post-judgment interest in this case. Section 1961 provides in relevant part:

   Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of judgment, at the rate allowed by State law.[2]

---

**41.** As a final argument, Technograph contends that both the TeGrotenhuis and Ziesenheim Groups are barred from enforcing the 1977 Agreement because of the principle of equitable estoppel. Technograph Brief at 34–35. In *Dickerson v. Colgrove,* 100 U.S. 578, 25 L.Ed. 618 (1879), the United States Supreme Court stated the following:

   The vital principle [of equitable estoppel] is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice.

100 U.S. at 580, 25 L.Ed. 618; *see Kurt H. Volk, Inc. v. Foundation for Christian Living,* 534 F.Supp. 1059, 1083 (S.D.N.Y.1982) (quoting and

applying *Dickerson* ). Applying this standard, Technograph argues that the TeGrotenhuis and Ziesenheim Groups accepted the tendered payments and then changed their position to the detriment of Technograph's tax position. As this Opinion points out, the Licensors never accepted any offer made by Technograph. Consequently, any injury that Technograph may suffer due to the enforcement of the 1977 Agreement was caused by its own unilateral actions, and not those of the Licensors.

**1.** This figure represents the final amount of pre-judgment interest due pursuant to the Court's Order of October 6, 1980.

**2.** On April 2, 1982, Congress amended 28 U.S.C. § 1961. The amendment changes the basis for the rate of post-judgment interest from "the rate allowed by State law" to the "rate equal to the coupon issue yield equivalent

Consequently, in resolving this matter the Court must award post-judgment interest at the rate permitted by Delaware law on the date judgment was entered, October 6, 1980.

The rate of interest allowed on judgments in Delaware is the same as the "legal rate of interest" found in 6 *Del.C.* § 2301.[3] *Rollins Environmental Services, Inc. v. WSMW Industries, Inc.*, 426 A.2d 1363, 1367 (Del.Super.Ct.1980). The amended 6 *Del.C.* § 2301(a), which became effective on April 18, 1980, provides in relevant part:

> Any lender may charge and collect from a borrower interest at any rate agreed upon in writing not in excess of 5% over the Federal Reserve discount rate including any surcharge thereon, and judgments entered after May 13, 1980, shall bear interest at the rate in the contract sued upon. Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due; provided, that where the time from which interest is due predates April 18, 1980, the legal rate shall remain as it was at such time.

First, this case does not involve a contract which specifies an interest rate. Applying the remainder of this statutory provision; because judgment was entered on October 6, 1980, which is after April 18, 1980, the proviso is also inapplicable. Consequently, it seems obvious to the Court that 6 *Del.C.* § 2301(a) requires a post-judgment interest rate at 5 percent above the Federal Reserve discount rate in existence on October 6, 1980. The Federal Reserve discount rate on October 6, 1980 was 11 percent. Therefore, pursuant to Section 2301(a), the rate of post-judgment interest in this case must be set at 16 percent.

General Motors, however, contends that the rate of post-judgment interest should be fixed at 6 percent, not 16 percent. General Motors bases its contention on the fact that pre-judgment interest was awarded from 1956 in this case, which is well before April 18, 1980. The "legal rate of interest" on judgments prior to April 18, 1980, was 6 percent. *See Rollins Environmental Services, Inc.*, 426 A.2d at 1366. General Motors cites to several Delaware state court and federal court diversity cases which hold that when pre-judgment interest is due before April 18, 1980, the rate of pre-judgment interest should be fixed at 6 percent. *See, e.g., Oliver B. Cannon and Son, Inc. v. Fidelity and Casualty Co. of New York*, C.A. 79–129 (Dkt. Item 210), Slip Op. at 2–4 (D.Del. June 8, 1982); *Rollins Environmental Services, Inc.*, 426 A.2d at 1368–69. These cases further hold that if prejudgment interest is fixed at 6 percent because it was due before April 18, 1980, post-judgment interest must also be fixed at 6 percent, even though final judgment was entered after April 18, 1980. *Oliver B. Cannon and Son, Inc.*, Slip Op. at 4–5; *Rollins Environmental Services, Inc.*, 426 A.2d at 1368. The rationale for these decisions is that 6 *Del.C.* § 2301 has been construed not to allow for the segmentation of the rate of interest based upon the formal entry of judgment. *See Papendick v. Robert Bosch GmbH*, 562–CA–1977, Slip Op. at 4 (Del.Super.Ct. August 4, 1981), *aff'd*, No. 238 1981 (Del. March 11, 1982) (unreported opinion). General Motors in essence contends that post-judgment interest should be set at 6 percent because pre-judgment interest was awarded from a date prior to April 18, 1980.

---

(as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." Act of April 2, 1982, Pub.L. No. 97–164, Sec. 302(a), 1982 U.S.Code Cong. & Ad.News (96 Stat.) 55–6. The amendment, however, does not impact upon this case because it did not take effect until October 1, 1982, well after judgment was entered. *See id.*, Sec. 402 at (96 Stat.) 57.

3. Delaware Courts of Equity may fix interest rates above the legal rate found in 6 *Del.C.* § 2301 in the interests of fairness. *See Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 506 (Del.1981). The plaintiff contends that as a patent court this Court is a court of equity, and can apply a rate of interest greater than that provided for in 6 *Del.C.* § 2301. The Court does not address this contention, however, because 6 *Del.C.* § 2301 provides an adequate rate of post-judgment interest in this case.

The Court cannot accept General Motors argument.

■ The cases cited by General Motors are all state court cases or federal diversity cases *where the law governing the rate of both pre-judgment and post-judgment interest was the law of Delaware. See, e.g., Oliver B. Cannon and Son, Inc.,* Slip Op. at 1–2, 4–5. Pre-judgment interest in this patent litigation was awarded in the Court's discretion solely as a matter of federal law pursuant to 35 U.S.C. § 284. *See General Motors Corp. v. Devex Corp.,* —— U.S. ——, 103 S.Ct. 2058, 2060, 76 L.Ed.2d 211 (1983). Therefore, the Court finds that the cases cited by General Motors are inapposite. State law had absolutely no bearing on the award of pre-judgment interest. The law of Delaware has application in this case only on interest awarded after October 16, 1980 pursuant to 28 U.S.C. § 1961. The fact that pre-judgment interest was awarded as a matter of federal law from a date prior to April 18, 1980, is completely irrelevant in determining what the rate of post-judgment interest should be under 6 *Del.C.* § 2301 on a judgment entered after April 18, 1980. Consequently, the Court holds that the rate of post-judgment interest will be 16 percent.[4]

■ The Court now turns to the plaintiffs' claim pertaining to delay damages. The parties agree that post-judgment interest runs on the $8,813,945.50 royalty award from October 6, 1980, the date judgment was entered, to July 7, 1982, the date that General Motors paid the royalty award. The parties further agree that post-judgment interest runs on the $11,022,824.97 pre-judgment interest award from October 6, 1980, the date the judgment was entered, to June 6, 1983, the date that General Motors paid the pre-judgment interest. The plaintiffs, however, make other claims for post-judgment interest that General Motors does not agree to.

In addition to the post-judgment interest that the parties agree upon, the plaintiffs claim they are entitled to interest on the unpaid post-judgment interest that accrued on the $8,813,945.50 royalty award from October 6, 1980, the date of judgment, to July 7, 1982, the date of payment of the royalty award. Similarly, the plaintiffs claim they are entitled to interest on the unpaid post-judgment interest that accrued on the $11,022,824.97 pre-judgment interest award from October 6, 1980, the date of judgment, to June 6, 1983, the date of payment of the pre-judgment interest. The plaintiffs correctly point out that based upon a 16 percent interest rate, approximately $2,000,000 in post-judgment interest accrued on the $8,813,945.50 royalty award from October 6, 1980 to July 7, 1982. The plaintiffs seek 16 percent interest on this $2,000,000 from July 7, 1982, the date the plaintiffs claim this post-judgment interest should have been paid, until the date it is actually paid. The plaintiffs similarly point out that based upon a 16 percent interest rate, $4,701,474.05 in post-judgment interest accrued on the pre-judgment interest award from October 6, 1980 to June 6, 1983. The plaintiffs seek 16 percent interest on this $4,701,474.05 in post-judgment interest from June 6, 1983, the date the plaintiffs claim this post-judgment interest should have been paid, until the date it is actually paid. The plaintiffs claim they are entitled to this additional interest as "delay damages" because General Motors wrongfully withheld payment of post-judgment interest. The plaintiffs' position is without merit.

As of this time, the Court has not ordered post-judgment interest to be paid. There-

---

4. Even assuming *arguendo* that the decisions cited by General Motors were applicable to this case, the Court would still not fix the rate of post-judgment interest at 6 percent. The cases cited by General Motors hold that 6 *Del.C.* § 2301 does not allow for the segmentation of the rate of interest based upon the formal entry of judgment. *See, e.g., Papendick,* Slip Op. at 4. In other words, these decisions "have held that the rate of post-judgment interest should be the same as pre-judgment interest." *Oliver B. Cannon and Son, Inc.,* Slip Op. at 5. In this case, pre-judgment interest was fixed at the Moody's Average Corporate Bond Rate. Consequently, this rate, which was approximately 15 percent for the relevant time period, and not the 6 percent rate urged by General Motors, would be the proper rate of post-judgment interest if the precedent cited by General Motors was applicable to this case.

fore, the plaintiffs are incorrect when they maintain that post-judgment interest was due on the royalty award and the pre-judgment interest award on July 7, 1982 and June 6, 1983, respectively. Because the Court has not yet ordered the payment of post-judgment interest, General Motors has not delayed in the payment of that interest. Consequently, there can be no "delay damages." What the plaintiffs actually seek is interest on interest, i.e., compound interest, which is not permitted under Delaware law. *See, e.g., Pack & Process, Inc. v. Nabisco, Inc.,* C.A. No. 78–285, Slip Op. at 6–7 (D.Del. September 18, 1981) (and authorities cited therein). Therefore, the plaintiffs claim for "delay damages" will not be allowed.

The Court requests the parties to calculate the interest due in accordance with this Opinion, and submit an Order within five days from the date of entry of this Opinion.