**DEVEX CORPORATION, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Frederick B. ZIESENHEIM, et al., Plaintiffs,**

v.

**TECHNOGRAPH, INC., Defendant.**

**Civ. A. Nos. 3058 CMW, 83–567 CMW.**

United States District Court, D. Delaware.

Jan. 20, 1984.

---

Robert K. Payson of Potter, Anderson & Corroon, Wilmington, Del., for plaintiffs in No. 3058 and defendant in No. 83–567; Sidney Bender and Aaron Lewittes of Leventritt, Lewittes & Bender, Garden City, N.Y., of counsel.

Arthur G. Connolly and Arthur G. Connolly, Jr. of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for defendant in No. 3058; George E. Frost of Barnes, Kisselle, Raisch, Choate, Whittemore & Hulbert, Detroit, Mich., of counsel.

William H. Sudell, Jr. and Denison H. Hatch, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs in No. 83–567.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

A ruling from this Court is once again required in this long and difficult patent litigation because several plaintiffs remain unable to agree on how money received as a result of this litigation should be distributed and on whether a claim for attorney's fees should be honored. The TeGrotenhuis and Ziesenheim plaintiffs (hereinafter "T & Z") have filed a complaint alleging that they are entitled to interest on various amounts received by them as a result of this litigation and that TeGrotenhuis is entitled to certain attorney's fees. Technograph, Inc. (hereinafter "Technograph") has filed a motion for summary judgment.[1]

■ There are five counts in the complaint. In Count One, T & Z seek to obtain interest that accrued on the balance of the purchase price due to them under the exclusive license they gave to Technograph while this fund was in the custody of the Court.[2] (Complaint ¶ 6). In Count Two, T

1. On August 30, 1983, T & Z filed amended crossclaims in this action. (Dkt. Nos. 715, 716). On September 6, 1983, T & Z filed a new complaint in Civil Action No. 83–567. This complaint is substantially identical to the amended crossclaims. On September 8, 1983, Technograph filed a motion to dismiss, or alternatively, for summary judgment with respect to the amended crossclaims and the complaint. (Dkt. No. 722). By Stipulation and Order entered by the Court on September 9, 1983 (Dkt. No. 723), the amended crossclaims and the complaint were consolidated for all purposes.

The parties agree that the complaint supersedes the amended crossclaims. See Technograph's Opening Brief in Support of its Motion to Dismiss, or Alternatively, for Summary Judgment, at 1 (Dkt. No. 729); T & Z's Answering Brief in Opposition to Technograph's Motion to Dismiss, at 1 (Dkt. No. 746). Therefore, this Opinion will only address the complaint.

2. T & Z also sought to obtain payment of the balance of the purchase price. Count One is now moot insofar as it demands payment of the balance of the purchase price since the Court has already ordered that the balance be paid

& Z allege that they are "entitled to post-judgment interest on the Court's Final Judgment of October 6, 1980, pro rata in accordance with their interests in that judgment." (Complaint ¶ 13). Counts Three and Four present an alternative theory of recovery to Count Two under which T & Z demand interest for an alleged breach of contract and fiduciary duty on the ground that Technograph should have executed on the Final Judgment against General Motors Corporation (hereinafter "GM"). In Count Five, T & Z allege a claim by TeGrotenhuis for personal services as an attorney in the amount of $41,000. For the reasons discussed below, the Court grants summary judgment for Technograph on Counts One, Two, Three and Four and denies summary judgment on Count Five of the Complaint.[3]

## FACTS

While the legal issues governing the disposition of the present motion are fairly straightforward, the factual background is sufficiently complex to warrant a brief explanation of how this litigation arrived at its present stage. Therefore, the Court will initially present a summary of the relevant undisputed facts in this lawsuit and then discuss each issue raised by T & Z's complaint in sequence.[4]

This case began twenty-seven years ago as a patent infringement suit in the Northern District of Illinois. As stated in an earlier opinion:

The patent involved in this case is Reissue Patent No. 24,017 (hereinafter "Henricks Patent") issued to John A. Henricks, President of Devex Corporation, on June 7, 1955, on Original Patent No. 2,588,234, dated March 4, 1952. Subsequently, the Henricks Patent was assigned by Devex Corporation (hereinafter "Devex") and Henricks to William M. McCoy, Theodore A. TeGrotenhuis, and Frederick B. Ziesenheim. These three individuals were attorneys, each involved in prosecuting infringement claims concerning the Henricks Patent.

In 1964, McCoy, TeGrotenhuis, and Ziesenheim (hereinafter referred to as "Licensors"), entered into an exclusive License Agreement with Technograph, Inc. (hereinafter "Technograph"), a North Carolina corporation, concerning the Henricks Patent. The License Agreement vested Technograph with all significant rights in the Henricks Patent, with the Licensors retaining only bare legal title. The 1964 License Agreement provided, *inter alia*, that Technograph would pay the Licensors $6,000,000 from monies received through sub-license

from Technograph's GM Fund and Technograph has already complied with that Order.

**3.** The parties have submitted several affidavits to the Court. *See* Affidavit of Sidney Bender (Dkt. No. 730); Affidavit of Theodore A. TeGrotenhuis (Dkt. No. 747). Under Fed.R.Civ.P. 12(b), "[i]f, on a motion asserting the defense numbered (6) to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleading are presented and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56." Because matters outside the pleading have been submitted, the Court will treat the present motion as a motion for summary judgment. Accordingly, the Court will grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Any doubt as to the existence of genuine issues of fact will be resolved against the moving party and any reasonable inferences from the facts will be resolved in favor of the party against whom the judgment may be entered. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982); *Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters and Joinders*, 676 F.2d 81, 84 (3d Cir.1982).

**4.** For a more complete explanation of the history and background of this case, see the published opinions in *Devex Corp. v. General Motors Corp.*, reported as follows: 263 F.Supp. 17 (D.Del.1967); 275 F.Supp. 310 (D.Del.1967); 285 F.Supp. 109 (D.Del.1968); 316 F.Supp. 1376 (D.Del.1970), *rev'd.*, 467 F.2d 257 (3d Cir.1972); *cert. denied*, 411 U.S. 973, 93 S.Ct. 2145, 36 L.Ed.2d 696 (1973); 494 F.Supp. 1369 (D.Del. 1980), *aff'd.*, 667 F.2d 347 (3d Cir.1981), *aff'd.*, —— U.S. ——, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); 569 F.Supp. 1354 (D.Del.1983).

agreements and infringement suit judgments or settlements relating to the Henricks Patent.

*See Devex Corp. v. General Motors Corp.*, 569 F.Supp. 1354, 1356 (D.Del.1983) (footnotes omitted). The 1964 License Agreement was subsequently modified on January 31, 1977 to provide the Licensors with a total purchase price of $5,803,040,[5] payable only out of the General Motors Fund (hereinafter "GM Fund") created by Technograph.[6]

The 1977 Agreement provides Technograph with a license which includes, "without limitation, the right to sue for, obtain, and keep full equitable and legal relief for past and future infringement in pending and any future litigation."[7] Technograph is required to "deposit to the GM Fund all amounts received as a result of any settlement or judgment from the GM litigation."[8] Article 3 of the Agreement sets out a distribution scheme from the GM Fund. After the payment of certain priority claims, Article 3 provides for distribution "of the balance to the Licensors and to Technograph in the following proportions: 80% or $5,803,040, whichever is less, to the licensors, and ... the amount of the balance remaining ... will be paid to Technograph."[9] Because the $5,803,040.00 purchase price was payable only out of the GM Fund, and because no amounts could be deposited in the GM Fund until judgment had been entered in this litigation, distributions to the Licensors in accordance with the 1977 Agreement were contingent on a number of judicial decisions.

The first judicial decision of any consequence in relation to the 1977 Agreement was this Court's entry of Final Judgment in this action on October 6, 1980, awarding plaintiffs a reasonable royalty, prejudgment interest, postjudgment interest, and costs. (Dkt. No. 636). GM then appealed and the Third Circuit affirmed the judgment.[10] GM then petitioned the United States Supreme Court for certiorari. On May 24, 1982, the Supreme Court denied GM's petition for certiorari except on the issue of prejudgment interest.[11] After the Supreme Court's May 24, 1982 Order, Technograph filed a motion in this Court on June 1, 1982 to require GM to pay a reasonable royalty award plus postjudgment interest. (Dkt. No. 649). This Court recognized that it lacked jurisdiction to entertain such a motion, and on June 8, 1982, Technograph filed a motion in the Third Circuit seeking issuance of a mandate affirming the $8,813,945.50 reasonable royalty award plus postjudgment interest thereon. On June 30, 1982, the Third Circuit granted the motion, and on July 7, 1972, GM paid $8,813,945.50 into this Court. This Court distributed the above amount to the GM Fund. Technograph then paid priority claims in accordance with the 1977 Agreement. After these priority claims were satisfied, Technograph distributed $3,801,-794.27 out of the GM Fund to the Licensors, and the remainder was paid out to Technograph. Under the terms of the 1977 Agreement, this left a balance of $2,001,-245.73 due to the Licensors collectively (or $667,081.91 each) if and when additional money was received as a result of this litigation.

---

**5.** The purchase price was apparently reduced to reflect payments already made to the Licensors that were part of the original $6 million purchase price.

**6.** *See* Modification and Restatement of Agreement of Exclusive License to Technograph, Inc. (hereinafter "1977 Agreement") at 2–3. Exhibit A to Dkt. No. 691. The GM Fund was expressly provided for in the 1977 Agreement and was to include "all amounts received as a result of any settlement or judgment from the GM litigation." Under the 1977 Agreement, Technograph was to deposit any money received from the GM litigation into the GM Fund and then distribute it in

accordance with the distribution scheme set out in Article 3 of the Agreement. *See id.* at 3–4.

**7.** *See id.* at 2.

**8.** *See id.* at 3.

**9.** *See id.* at 5.

**10.** *See General Motors Corp. v. Devex Corp.,* 667 F.2d 347 (3d Cir.1981).

**11.** *See General Motors Corp. v. Devex Corp.,* 456 U.S. 988, 102 S.Ct. 2267, 73 L.Ed.2d 1283 (1982).

Additional money from GM was soon forthcoming. On May 24, 1983, the Supreme Court affirmed the award of prejudgment interest in the amount of $11,-022,854.97. *See General Motors Corp. v. Devex Corp.*, — U.S. —, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). On June 6, 1983, GM paid the $11,022,854.97 into Court. Because of the dispute among the plaintiffs concerning the distribution of this money, the award of prejudgment interest was not paid into the GM Fund until August 8, 1983, in accordance with this Court's Opinion and Order. *See Devex Corp. v. General Motors Corp.*, 569 F.Supp. 1354 (D.Del. 1983). On August 18, 1983, Technograph paid TeGrotenhuis and Ziesenheim $667,-081.91 each out of the GM Fund, which represented the balance of the purchase price due to them under the 1977 Agreement.[12]

Since the purchase price due to the Licensors under the 1977 Agreement has already been fully paid by Technograph, the present dispute involves claims for interest on the amounts already received by T & Z. In addition to these claims for interest, the present motion also involves TeGrotenhuis' claim for attorney's fees. The Court will initially address the claim for interest presented in Count One, then consider the claims presented in Counts Two, Three, and Four for a share of the postjudgment interest, and finally, discuss the claim for attorney's fees raised in Count Five.

## COUNT ONE

In Count One, T & Z claim that they are entitled to interest that accrued on the balance of the purchase price due to them under the 1977 Agreement from June 6, 1983, the date the award of prejudgment interest was paid into Court, until August 18, 1983, the date payment from the GM Fund to T & Z was made. This issue has already been ruled upon by this Court. This Court's Opinion and Order of August 8, 1983 awarded T & Z the balance of the purchase price due to them under the 1977 Agreement. *See Devex Corp. v. General Motors Corp.*, 569 F.Supp. 1354 (D.Del. 1983). On August 9, 1983, T & Z moved to amend the Order to require Technograph to pay interest that accrued on the funds ordered to be paid while they were in the custody of the Court. The Court denied the motion to amend at an August 23, 1983 oral argument on the ground that such interest belonged to Technograph and not to T & Z,[13] and entered an Order to that effect on August 29, 1983. (Dkt. No. 713). Count One is thus an attempt by T·& Z to have the Court reconsider and alter its previous ruling.

Technograph claims that the matter is settled because of the doctrines of res judicata, law of the case, and estoppel by election. T & Z argue that reconsideration of this matter is proper because no final order has been entered and because Fed.R.Civ.P. 54(b) permits revision of the Court's decisions on August 8 and August 29, 1983 "at

---

**12.** In addition to the purchase price, T & Z have received substantial attorneys' fees and interest on those fees as a result of this litigation. On July 27, 1982, the following amounts were distributed upon the instructions of Technograph:

"(a) To Buell, Blenko, Ziesenheim & Beck, P.C., the total sum of $1,122,647.27 comprising the sums of $539,889.32, $452,736.25, $66,-418.91, and $63,602.79, and constituting payment in full of all amounts owing to it and its predecessor firms through March 31, 1982....

\* \* \* \* \* \*

(e) To Theodore A. TeGrotenhuis, Esq., the total sum of $20,404.69 comprising the sums of $9,287.69 and $11,117.00 and constituting payment in full of all amounts owing to him." *See* Exhibit LL to Affidavit of Sidney Bender (Dkt. No. 730). One of the reasons why the

amounts distributed to the various law firms involved in this litigation were so substantial is because Technograph agreed to pay 20% annual simple interest on the fees in return for the law firms deferring payment. *See* Exhibit JJ to Affidavit of Sidney Bender (Dkt. No. 730).

**13.** *See* Transcript of August 23, 1983 (Dkt. No. 711) at p. 8:

MR. SUDELL: And you are ruling, therefore, that Technograph receives the entire interest—
THE COURT: Right.
MR. SUDELL: —that accumulated on those funds?
THE COURT: Absolutely. That is the way I ruled and that is the logic I view.

any time before the entry of judgment adjudicating all the claims." While it is possible that Technograph is correct in its arguments that res judicata, law of the case, and estoppel by election should preclude reconsideration of the issue raised in Count One, the Court, in order to more fully express its view and to make clear the basis for its decision, has reconsidered its previous ruling. However, the Court, after reconsideration, is still of the opinion that T & Z were each only entitled to the $667,-081.91 which represented the balance of the purchase price due to them under the 1977 Agreement.

T & Z's argument in Count One is based on a number of cases which stand for the proposition that interest earned on a fund paid into escrow pending the outcome of litigation is to be allocated to those who are ultimately determined to be the owners of the fund. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980); *James Talcott, Inc. v. Allahabad Bank, Ltd.,* 444 F.2d 451, 463 (5th Cir.), *cert. denied sub nom City Trade & Industries, Ltd. v. Allahabad Bank, Ltd.,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); *Pepsi Cola Bottling Company of Cincinnati v. Woodlawn Canners, Inc.,* C.A. No. 6161 (Del.Ch., October 11, 1983). Because T & Z were ultimately determined to be entitled to $667,081.91 each from the funds paid into Court on June 8, 1983, they claim that they are entitled to interest earned on the above amount from June 8, 1983 until August 18, 1983, when Technograph paid them pursuant to Court Order.

The problem with T & Z's argument is that it ignores the express language of the 1977 Agreement. Under the 1977 Agreement, the Licensors were only entitled to receive the purchase price of $5,803,040. Any amounts received over and above the purchase price were to go to Technograph. Moreover, under the 1977 Agreement, there was no particular time at which the Licensors were entitled to receive the purchase price for the simple reason that the receipt of money from the GM litigation was contingent on a number of judicial decisions yet to be made. The only requirement in the 1977 Agreement was that distributions from the GM Fund were to be made within 30 days of Technograph's receipt of the money.[14]

T & Z had no right to receive any money deposited into Court as a result of this litigation until it was paid into the GM Fund. Indeed, one of the basic premises of T & Z's argument accepted by the Court in its August 8, 1983 Opinion was that the balance of the purchase price due to T & Z could only be paid out to T & Z after those amounts were paid into the GM Fund.[15] Surely, if Technograph had no right to distribute any amounts received as a result of this litigation until such amounts were deposited in the GM Fund, T & Z had no right to any amounts deposited into Court until this Court determined that such amounts should be paid into the GM Fund.

 As T & Z acknowledge, interest is generally allowed only when money belonging to another is not paid or turned over to the person entitled to receive it at the time when it should have been paid or turned over.[16] Here it was not until August 8, 1983, that this Court ordered that the amounts deposited into Court should be paid into the GM Fund. On August 18, 1983, Technograph paid the balance of the purchase price to T & Z, well within the 30 day period prescribed by the 1977 Agreement.[17] Since T & Z were only entitled to receive the balance of the purchase price within 30 days after this Court's Order of

---

**14.** *See* 1977 Agreement, Article 3, ¶ B, at 3; Exhibit A to Dkt. No. 691.

**15.** *See Devex Corp. v. General Motors Corp.,* 569 F.Supp. 1354, 1361 (D.Del.1983) ("Article 2 and Article 3 of the 1977 Agreement clearly indicate that the TeGrotenhuis and Ziesenheim groups were to be paid the $667,081.91 balance due

only out of the Technograph/GM Fund, as money was paid into that Fund.") (emphasis added).

**16.** *See* Answering Brief of the TeGrotenhuis and Ziesenheim plaintiffs, at 13. (Dkt. No. 746).

**17.** *See supra* n. 14.

August 8, 1983 requiring the amounts deposited into Court to be paid into the GM Fund, and since Technograph was not entitled to distribute the balance until the amounts deposited into Court were paid into the GM Fund, no interest should be allowed. Thus, T & Z's claim in Count One for interest from June 8, 1983 to August 18, 1983 on the funds deposited into Court must fail.

## COUNT TWO

Count Two alleges that T & Z are "entitled to post-judgment interest on the Court's final Judgment of October 6, 1980, pro rata in accordance with their interests in that judgment." (Complaint ¶ 13). T & Z's argument with respect to this claim relies on a number of cases in which post-judgment interest has been distributed among the parties according to their share of the judgment. *See Howell v. Marmpe-gaso Compania Naviera,* 578 F.2d 86, 87 (5th Cir.1978); *Candiano v. Moore-McCormack Lines, Inc.,* 407 F.2d 385, 387 (2d Cir.1969); *Becker v. Huss Co., Inc.,* 43 N.Y.2d 527, 402 N.Y.S.2d 980, 986, 373 N.E.2d 1205, 1211 (N.Y.1978); *Fireman's Fund Indemnity Co. v. Batts,* 11 N.J.Super. 242, 78 A.2d 293, 295 (1951). T & Z contend that the 1977 Agreement does not govern the distribution of postjudgment interest, but rather applies only to the distribution of the reasonable royalty and prejudgment interest awards. Therefore, T & Z contend that the general rule followed in the cases cited above should apply. In response, Technograph argues that the 1977 Agreement does govern the distribution of postjudgment interest and that, since T & Z have already received the full purchase price due to them under the 1977 Agreement, they are not entitled to any of the postjudgment interest. Technograph also makes a number of arguments based on the doctrines of res judicata, law of the case, and estoppel by election which the Court finds it unnecessary to address since the Court is convinced that the 1977 Agree-ment precludes any recovery of postjudgment interest by T & Z.

■ As pointed out earlier in this Opinion, Article 1 of the 1977 Agreement grants to Technograph "without limitation, the right to sue for, obtain and keep full equitable and legal relief for past and future infringement in pending and any future litigation." [18] Article 3A requires Technograph to deposit to the GM Fund "all amounts received as a result of any settlement or judgment from the GM litigation." [19] After the payment of certain priority claims, Article 3B provides for distribution from the GM Fund "of the balance to the Licensors and to Technograph in the following propositions: 80% or $5,803,040, whichever is less, to the licensors, and ... the amount of the balance remaining will be paid to Technograph." [20] Under the language quoted above, it is clear that the Licensors bargained away their rights to any relief granted in the GM litigation in return for the purchase price of $5,803,040.00. Since they have already received the purchase price, they are not entitled to share in the postjudgment interest.

T & Z's argument that the 1977 Agreement only governs the awards of a reasonable royalty and prejudgment interest is based on their contention that the phrase "full equitable and legal relief for past and future infringement" in the Agreement does not include any relief afforded to Technograph in the form of postjudgment interest. However, Technograph's rights "to sue for, obtain, and keep full equitable and legal relief for past and future infringement in pending and future litigation" were granted by the Licensors "without limitation." There is no indication in the 1977 Agreement of any intent on the part of the Licensors or Technograph to treat postjudgment interest differently from any of the other components of relief afforded as a result of success in this litigation. In fact, the 1977 Agreement, by

18. *See supra* n. 7.

19. *See supra* n. 8.

20. *See supra* n. 9.

requiring that "all amounts received as a result of any settlement or judgment from the GM litigation" be deposited in the GM Fund, suggests that *all* components of the relief afforded in this litigation, including postjudgment interest, should be treated in the same way.

Certainly, an award of postjudgment interest under 28 U.S.C. § 1961 is part of the "full equitable and legal relief" which was awarded in this Court's Final Judgment of October 6, 1980. While postjudgment interest provides compensation for a delay in the payment of money due pending appeal, it is also part of the relief afforded to the plaintiff in a patent case who has been compelled to litigate his claim of infringement. Just as prejudgment interest provides full compensation for the defendant's infringement up until the time of judgment, postjudgment interest provides relief from the delay in compensation that results, not just from the defendant's decision to appeal, but ultimately, from the defendant's wrongful infringement and refusal to pay the patent owner royalties under his patent. In a patent case in which the defendant appeals, both prejudgment and postjudgment interest are needed to completely compensate the plaintiff for the defendant's infringement and both are proper components of the relief afforded as a result of success in litigation. Since both prejudgment and postjudgment interest are elements of the "full equitable and legal relief" awarded in this litigation, the Court concludes that the 1977 Agreement governs the distribution of the postjudgment interest as well as the distribution of the reasonable royalty and prejudgment interest.

Several actions by the parties support the Court's conclusion. First, on January 31, 1983, the representatives of William C. McCoy, one of the Licensors, entered into an agreement with Technograph in which they assigned all their interests in the Henricks Patent to Technograph in exchange for Technograph's promissory notes totaling $667,081.91. *See Devex Corp. v. General Motors Corp.*, 569 F.Supp. 1354, 1357 (D.Del.1983). No claim for interest was made.[21] Thus, the representatives of one of the Licensors appeared to believe that they were only entitled to the balance of the purchase price specified in the 1977 Agreement. Second, on June 17, 1982, Frederick Ziesenheim, wrote a letter to Sidney Bender in which he stated:

> "Article 2 of the Modification and Restatement of Agreement of Exclusive License to Technograph, Inc., dated January 31, 1977, obligates Technograph to create and enlarge the GM Fund. Consonant with that Agreement, Technograph is required to proceed diligently to get in hand and pay to the patent owners their share of the money which is due from GM under the judgment. That obligation is consistent with your obligation as lead counsel for *all* of the plaintiffs. In view of GM's refusal to pay any part of the judgment, Technograph is obligated to collect the royalty due *and postjudgment interest* in order to enlarge the GM Fund." (emphasis added)

*See* Exhibit F to Affidavit of Sidney Bender (Dkt. No. 730). Thus, at the time he wrote this letter, Ziesenheim appeared to believe that postjudgment interest would be deposited in the GM Fund under the provisions of the 1977 Agreement.[22] Third, on June

**21.** At the time McCoy's representatives assigned their interests to Technograph in exchange for Technograph's promissory notes totaling $667,081.91, they were fully aware that the plaintiffs would be entitled to postjudgment interest, although the appropriate rate of postjudgment interest was still in dispute. On May 24, 1982, the Supreme Court denied General Motors' petition for certiorari except on the issue of prejudgment interest. On June 30, 1982, the Third Circuit granted Technograph's motion seeking issuance of a mandate affirming the reasonable

royalty award plus postjudgment interest thereon. Thus, on January 31, 1983, when McCoy's representatives entered into the assignment, it was beyond dispute that postjudgment interest would be awarded. Nonetheless, no claim for a share of the postjudgment interest was made.

**22.** Mr. Ziesenheim's testimony at the accounting trial on February 5, 1979, also indicates that he believed that his recovery from any amounts received in the GM litigation would be limited

26, 1982, Theodore A. TeGrotenhuis wrote a letter to Sidney Bender in which he stated:

> "After full consideration, I conclude that the interests of the patent owners is best served by following the procedure outlined in Fred Ziesenheim's letter to you dated June 17, 1982 and obtaining a writ of execution immediately for the amount of principal (the royalty due) *and postjudgment interest.* This, I understand you refuse to do. Certainly, your obligation is to build up 'the fund' at the earliest possible moment and your failure to meet that obligation is contrary to the agreement with the patent owners." (emphasis added)

*See* Exhibit P to Affidavit of Sidney Bender (Dkt. No. 730). Thus, at the time he wrote this letter, TeGrotenhuis, like Ziesenheim, appeared to believe that postjudgment interest would be deposited in the GM Fund under the provisions of the 1977 Agreement.[23] The three instances mentioned above all support the Court's conclusions that the Licensors and Technograph intended for all amounts received as a result of this litigation, including postjudgment interest, to be deposited into the GM Fund under the 1977 Agreement and that the Licensors' recovery was to be limited to the purchase price specified in Article 2 of the Agreement. Therefore, the Court holds that the distribution of postjudgment interest is governed by the 1977 Agreement and that T & Z, having received the full purchase price they are entitled to under the Agreement, may not recover any share of the postjudgment interest under the theory set forth in Count Two.

### COUNTS THREE AND FOUR

[8] In Counts Three and Four, T & Z seek to receive a share of postjudgment interest on an alternative theory to that set forth in Count Two. Specifically, T & Z claim that from October 6, 1980 (the day the Final Judgment of this Court was entered), until August 30, 1983 (the day GM paid the postjudgment interest into Court), Technograph was derelict in enforcing GM's payment of the judgment and that such misconduct constituted a breach of contract and a breach of fiduciary duty. T & Z support this claim by noting an alleged conflict of interest between Bender, Technograph's lead counsel and owner of 28% of Technograph's stock, and the Licensors. T & Z argue that, if the 1977 Agreement governs the distribution of postjudgment interest, then Bender would benefit by a long delay in obtaining payment from GM (since Technograph would presumably recover a larger amount in postjudgment interest) while the Licensors would not.[24] T & Z conclude that summary judgment is inappropriate in this situation where the good faith of Technograph and its counsel are in issue.

In response, Technograph argues that it acted in good faith in fulfilling its contractual obligations and that it obtained payment from GM as promptly as possible. The Court agrees with Technograph and finds that T & Z have failed to present any evidence showing that Technograph or Bender acted in bad faith or that Technograph could have obtained payment sooner by execution. In fact, the record conclusively demonstrates that Technograph

---

to the purchase price specified in the 1977 Agreement:
> "Q. So that you and the other members of the firm and the people you have just identified would have up to a $2 million interest, is that correct?
> A. That is correct."

*See* Affidavit of Sidney Bender (Dkt. No. 730) at 29.

**23.** TeGrotenhuis' testimony at the accounting trial on February 5, 1979 also indicates that he believed that his recovery from any amounts received in the GM litigation would be limited

to the purchase price specified in the 1977 Agreement; he testified that "me and my family have an interest up to a maximum of $2 million in recovery after all obligations and attorneys' fees and so forth." *See* Affidavit of Sidney Bender (Dkt. No. 730) at 28.

**24.** It is unclear whether Bender will necessarily *benefit* from a delay in payment by GM. Rather, depending on market interest rates, Bender may simply be hurt less than T & Z by a delay in payment.

moved as effectively as possible to obtain prompt payment from GM.[25]

The undisputed facts are as follows: Final Judgment against GM was entered on October 6, 1980. Technograph made no attempt to execute on the judgment at this time because, under Fed.R.Civ.P. 62(d), GM had a right to stay execution pending appeal by putting up a bond.[26] Thus, until the Supreme Court's May 24, 1982 order denying GM's petition for certiorari except on the issue of prejudgment interest, there was no realistic possibility of executing on the judgment, and, in fact, T & Z never even suggested that GM be required to post a bond. Thus, there was clearly no breach of contract or fiduciary duty during the period from October 6, 1980 to May 24, 1982 and any award of interest as damages for failure to execute during this period would be inappropriate.

Following the Supreme Court's May 24, 1982 Order, Technograph filed a motion in this Court on June 1, 1982 to require GM to pay the reasonable royalty award plus postjudgment interest. (Dkt. No. 649). This Court recognized that it lacked jurisdiction to entertain such a motion, and on June 8, 1982, Technograph withdrew its motion in this Court and filed a motion in the Third Circuit seeking issuance of a mandate affirming the $8.8 million reasonable royalty award plus postjudgment interest. Following this motion, a disagreement arose among the plaintiffs for the first time as to how to proceed in order to collect the amounts due from GM. On June 14, 1982, one of the beneficiaries of the Ziesenheim Trust instructed Anderson, Ziesenheim, and Bender to execute and, if necessary, to make levy for the $8.8 million plus postjudgment interest. See Exhibit B attached to Affidavit of Sidney Bender (Dkt. No. 730). On June 17, 1982, Ziesenheim advised Bender that all members of his group desired payment without delay of the reasonable royalty award plus post-

judgment interest and to proceed with execution if necessary. See Exhibit F attached to Affidavit of Sidney Bender (Dkt. No. 730). On June 21, 1982, McCoy advised Ziesenheim that his group wanted to wait until the Third Circuit ruled on Technograph's motion before any attempt to levy and execute was made. See Exhibit H attached to Affidavit of Sidney Bender (Dkt. No. 730). On June 26, 1982, TeGrotenhuis told Bender that he favored Ziesenheim's suggestion as to how to proceed. See Exhibit P attached to Affidavit of Sidney Bender (Dkt. No. 730). Throughout this two week period, Bender's position was that the motion in the Third Circuit was the quickest way to obtain the money and that GM would oppose any attempt to execute and levy. Subsequent events proved that Bender's position was essentially correct because on June 30, 1982, the Third Circuit granted plaintiff's motion, and on July 7, 1982, GM paid $8.8 million into this Court. In these circumstances, it is clear that there was no possible breach of contract or fiduciary duty by refusing to execute. Because the steps taken by Technograph and Bender during the period from May 24, 1982 to July 7, 1982 were efficient and effective, any award of interest as damages for failure to execute during this period would be inappropriate.

Because of the dispute with GM as to the appropriate postjudgment interest rate, no interest payment was made on July 7, 1982. On July 13, 1982, plaintiffs filed their brief in support of their motion for postjudgment interest. (Dkt. No. 662). After several communications between counsel and this Court, on September 10, 1982, a conference was held and an order was entered refusing to determine the issues raised in plaintiffs' motion. (Dkt. No. 667). Following this Order, on September 22, 1982, plaintiffs attempted to execute for postjudgment interest against GM's property in Delaware. GM moved to vacate and/or

---

25. See the detailed recital of facts in Technograph's Opening Brief at 7–24 (Dkt. No. 729) and in the Affidavit of Sidney Bender at 4–28 (Dkt. No. 730).

26. Since GM is one of the largest corporations in the world, no one seriously considered the possibility that GM be required to post a bond.

stay execution. On September 28, 1982, this Court granted GM's motion for a stay. (Dkt. No. 669). No further attempts to execute for collection of the postjudgment interest were made until after the Supreme Court unanimously affirmed the judgment on May 25, 1983. During this period from September 28, 1982 to May 25, 1983, neither TeGrotenhuis or Ziesenheim suggested execution on the postjudgment interest or any other attempt to collect any other amounts from GM for the obvious reason that this Court had already granted GM's motion for a stay. It is clear from the facts above that there was no possible breach of contract or fiduciary duty by Technograph's failure to execute during the period from July 7, 1982 to May 25, 1983, since Technograph's attempts to obtain the postjudgment interest, first by motion and then by attempted execution, were rejected by this Court. Therefore, any award of interest as damages for failure to execute during this period would be inappropriate.

Following the Supreme Court's Opinion of May 25, 1983, GM paid the prejudgment interest of $11 million into Court. On June 22, 1983, plaintiffs filed their opening brief in support of their motion for postjudgment interest at 16%. (Dkt. No. 683). GM's answering brief was filed on July 14, 1983 (Dkt. No. 694), and plaintiffs' reply brief was filed on July 22, 1983 (Dkt. No. 701).

Oral argument was held on August 4, 1983, and on August 22, 1983, this Court filed an Opinion and entered an Order setting the postjudgment interest rate at 16%. *See Devex Corp. v. General Motors Corp.*, 569 F.Supp. 1354, 1365 (D.Del.1983). On August 30, 1983, GM paid over $7 million in postjudgment interest into Court. Thus, there can be no dispute that, from May 25, 1983 to August 30, 1983, Technograph moved quickly and effectively to obtain payment of the postjudgment interest. Any claim that Technograph breached its contractual obligations or fiduciary duties during this period is simply not supported by the record and, therefore, any award of interest for this period would be inappropriate.

■ Given the undisputed facts recited above, the Court concludes that there was no breach of contract or fiduciary duty on the part of Technograph by failing to execute on the judgment during the period from October 6, 1980 until August 30, 1983.[27] Summary judgment in favor of Technograph on Counts Three and Four will be granted.

## COUNT FIVE

Count Five is a claim by TeGrotenhuis for attorney's fees of $41,400 for services rendered at a deposition and at the trial

---

27. Even if the above facts were not so clear, T & Z should still not be able to recover under Counts Three and Four because of the general rule that any claim to interest for breach of contract is extinguished by suing for, and obtaining, payment of the balance due on the principal. As stated in Annot., 100 A.L.R. 96 (1936) at 105:

The general rule is also well-settled that where the contract is silent as to interest, so that, if it can be received at all, it is as an incident of the debt sued for and only as damages to make good to the creditor the loss he has sustained by reason of breach or default, an action to recover it cannot be maintained after the payment of the principal, as such interest cannot exist without the debt, and, the debt being extinguished, the right to claim interest must necessarily be extinguished also. *See Stewart v. Barnes,* 153 U.S. 456, 14 S.Ct. 849, 38 L.Ed. 781 (1893); *Pacific R. Co. v. U.S.,* 158 U.S. 118, 15 S.Ct. 766, 39 L.Ed. 918 (1895);

*Phillips Petroleum v. Riverview Gas Compression Co.,* 409 F.Supp. 486, 494 (N.D.Tex.1976) (rule applicable only in cases involving interest as damages); *McCreery v. Day,* 119 N.Y. 1, 23 N.E. 198 (1890); *Keybro Enterprises v. Four Seasons Caterers,* 25 A.D.2d 307, 269 N.Y.S.2d 291 (1966). Here, T & Z's theory in Counts Three and Four is that interest should be awarded as damages for an alleged breach of contract or fiduciary duty based on Technograph's failure to execute. Even assuming that such a breach exists, summary judgment on Counts Three and Four is appropriate under the general rule cited above since T & Z have already received the balance due on the principal that they were entitled to under the 1977 Agreement. When T & Z sued for and obtained the balance due to them under the 1977 Agreement, they extinguished any claim to interest based on a theory of breach of contract or fiduciary duty. Therefore, T & Z's claim to interest in Counts Three and Four must fail.

before the Master in this litigation. On January 18, 1983, TeGrotenhuis sent a letter and statement of personal services to Technograph and Bender in which he claimed legal fees for the following alleged services: (i) Deposition of Dr. Van-Waser in Nashville in the Spring of 1979 for two days—$1,400; (ii) Attendance at the trial before the Master in Wilmington for 50 days at 8 hours per day at $100 per hour during the period from October 31, 1979 through February 9, 1980—$40,000.[28] On February 18, 1983, Bender responded to TeGrotenhuis' letter of January 18, 1983, refusing to honor his claim for attorney's fees.[29]

Technograph claims that because the trial before the Master was concluded on February 14, 1979, more than three years before the crossclaims were filed in this case, Count Five is now barred by the statute of limitations.[30] Techno-

28. *See* Exhibits NN and OO attached to Affidavit of Sidney Bender (Dkt. No. 730). In fact, the trial before the Master took place on October 31, 1978 through February 14, 1979 and the Van-Waser deposition was taken prior to the commencement of the trial in October of 1978. *See* Report of Proceedings Before The Special Master (Dkt. No. 643).

29. Bender's letter stated:
 "At no time up until your recent letter of January 18, 1983 did you make a claim for legal fees for the alleged legal services rendered. Technograph denies any responsibility for such claim. Moreover, you testified in Wilmington, Delaware in support of the plaintiffs' claim for attorneys' fees and there was no claim presented for the fees that you are now claiming. In addition, your name never appeared as an attorney of record on the transcript, you did not sit at the counsel table and your name never appeared on any of our briefs. We only paid your expenses as a patent owner. In addition, I made it very clear to Fred Ziesenheim that you were not an attorney representing plaintiffs in the matter at trial. He so understood. You knew that the attorneys, Messrs. McCoy's and Ziesenheim's, firms were being compensated pursuant to bills rendered for services at the trial and yet you failed to submit a bill until January 18, 1983. Under the circumstances, Technograph cannot honor that claim."
*See* Exhibit PP to Affidavit of Sidney Bender (Dkt. No. 730). In addition to the above letter, Bender wrote another letter to Mr. William Sudell, TeGrotenhuis' attorney, on May 16, 1983, responding to TeGrotenhuis' claim for attorney's fees, in which he stated:
 "With respect to Ted TeGrotenhuis, Esq.'s claim for legal fees for alleged legal services rendered in the amount of $41,000, we have set forth our position in our letter to him of February 18, 1983. In addition, I am enclosing a copy of his letter to me dated June 11, 1979 in which he concedes that at the trial Herb Shortt rejected his bill for alleged services on the pre-trial accounting 'as not allowable in accordance with the agreement.' Mr. TeGrotenhuis also admitted in that letter that he 'felt like an outsider' at the trial. Thus,

even Mr. TeGrotenhuis did not believe that he was acting as an attorney for plaintiffs at the accounting trial between October 30, 1978 and February, 1979. Moreover, by letter agreement dated June 21, 1979 the amount of Ted TeGrotenhuis's claim for legal services per an April 1, 1978 invoice was settled at $5,000 plus interest; Technograph's payment to Mr. TeGrotenhuis was made in July of 1982. The June 21, 1979 letter agreement made no mention of any services rendered by Mr. TeGrotenhuis at the accounting trial from October 30, 1978 to February, 1979 because Mr. TeGrotenhuis was not making any such claim.
 Furthermore, Mr. TeGrotenhuis, as a patent owner, was kept fully advised of the fact that the plaintiffs submitted to the Court a claim for attorneys' fees through December 30, 1978 during the trial which did not include any claim for services rendered by Mr. TeGrotenhuis for the period from October 30, 1978 through December 31, 1978. Plaintiffs then supplemented their claim by an affidavit submitted to the Court dated November 16, 1978 in which I set forth plaintiffs' claims for attorneys' fees since January 1, 1978 which likewise did not include any amount for services rendered by Mr. TeGrotenhuis. Mr. TeGrotenhuis testified at the trial in support of plaintiffs' claim for attorneys' fees; his testimony did not include any claim for services by him at the accounting trial for the period commencing with the trial on October 30, 1978. Therefore, he concedes and is estopped from now claiming an attorney's fee for that period when he himself felt that he was an outsider."
*See* Exhibit QQ to Affidavit of Sidney Bender (Dkt. No. 730).

30. While Technograph initially argues that the one year statute of limitations covering work, labor, or personal services, 10 *Del.C.* § 8111, applies to Count Five, this Court has previously stated that the three year statute of limitations, 10 *Del.C.* § 8106, is applicable to a claim for attorneys' fees. *Spering v. Sullivan*, 361 F.Supp. 282, 286–87 (D.Del.1973) ("if he entered the more normal attorney-client relationship of independent contractor, the three year statute of

graph also claims that TeGrotenhuis was never retained by Technograph to render the alleged services.[31] Because it is unclear whether the statute of limitations has run and because the Court cannot say, as a matter of law, that TeGrotenhuis was never retained to render the alleged legal services, the Court denies summary judgment on Count Five.

With respect to Technograph's claim that the statute of limitations has run on TeGrotenhuis' claim for attorney fees, there is an issue as to when the statute of limitations begins to run on a claim by an attorney for compensation for his services. The general rule is as follows:

> Where an attorney's employment is regarded as being single and continuous, his claim for services is not subject to the running of the statute of limitations until the termination of the employment, the contract being regarded as an entire one, but where his services are severable and distinct, with no identifying continuity, the statute will begin to run on each service at the time it is rendered.

Annot., 60 A.L.R.2d 1008, 1017 (1958). *See Spering v. Sullivan*, 361 F.Supp. 282, 287 (D.Del.1973) ("Since the agreement apparently required services of a continuing nature and failed to provide for a termination date, Spering's claim would not have accrued prior to the time when his services were actually terminated."); *Rhynard v. Goubeaux*, 117 Ohio App. 435, 192 N.E.2d 785 (Ohio App.1962) ("Ordinarily, where an attorney's employment is regarded as being single and continuous, his claim is not subject to the running of the statute of limitations until the termination of the employment, the contract being regarded as an entire one, but where his services are severable and distinct, with no identifying continuity, the statute will begin to run on each service at the time it is rendered.").

Technograph argues that TeGrotenhuis' alleged employment involved periodic payments for discontinuous services rendered. Thus, under the rule stated above, Technograph concludes that the statute began to run on February 14, 1979 (when the hearing before the Master ended); over three years before T & Z raised this claim on July 18, 1983. However, T & Z argue that TeGrotenhuis' cause of action did not accrue until Bender rejected his bill. In support of this claim, T & Z cite cases which stand for the proposition that a cause of

---

limitations would be applicable, 10 *Del.C.* § 8106").

**31.** Technograph further claims that Count Five should have been litigated with the earlier claims determined by this Court's Opinion and Order of August 8, 1983 and is, therefore, barred by the doctrine of res judicata (splitting a cause of action). The Court finds this claim to be meritless since the claim in Count Five does not arise out of the same transaction or occurrence that formed the basis for T & Z's claims to recover the balance of the purchase price due under the 1977 Agreement. *Cf. Maldonado v. Flynn*, 417 A.2d 378, 381 (Del.Ch.1980) ("The modern transactional view of the doctrine of res judicata, however, does not require that the claim subsequently asserted be based on a same cause of action to be barred, but permits the doctrine to be invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis for the prior adjudication."). Here, the claim for attorneys' fees raises different issues, concerns different acts by TeGrotenhuis and Technograph giving rise to the alleged cause of action and involves proof of different facts. Therefore, the doctrine of res judicata is not applicable to this claim.

Technograph also claims that T & Z should be estopped from making any claim for attorneys' fees since he failed to assert that claim in a timely fashion. However, it is well settled that the equitable doctrine of estoppel requires more for its operation than a delay in asserting a claim. *See Hank Thorp, Inc. v. Minilite, Inc.*, 474 F.Supp. 228, 239 (D.Del.1979). In particular, a successful claim of estoppel requires a showing of prejudicial change of position by the one asserting the estoppel. *Id.* at 239. Here, Technograph has not yet made sufficient allegations to show that any prejudicial change of its position occurred as a result of its reliance on TeGrotenhuis' failure to assert his claim in a timely fashion. Certainly, the fact that Technograph paid attorneys' fees to TeGrotenhuis and to other attorneys after the conclusion of the trial before the Master and prior to TeGrotenhuis' assertion of his claim for $41,400 does not, in and of itself, show detrimental reliance on the part of Technograph. Therefore, Technograph's argument that summary judgment should be granted on the ground of equitable estoppel must fail.

action for breach of contract does not accrue until the time of the breach. *See Hood v. McConemy*, 53 F.R.D. 435, 445 (D.Del.1971); *Nardo v. Guido DeAscanis & Sons, Inc.*, 254 A.2d 254, 256 (Del.Super. 1969). Since Bender rejected TeGrotenhuis' bill on February 18, 1983, T & Z argue that the statute should run from that date.

On the present record, the Court cannot determine the date from which the statute should run. The date on which the statute begins to run depends on the type of employment arrangement (if any) between Technograph and TeGrotenhuis. If TeGrotenhuis has been retained and never terminated by Technograph, and if he has rendered continuous services throughout the course of this litigation, then the statute would not begin to run on the date that the hearing before the Master concluded. On the other hand, if TeGrotenhuis' alleged services at the deposition and the hearing are not part of a continuous course of legal counseling, but are simply services of a severable and distinct nature, then the statute would begin to run on the date that the

hearing before the Master concluded. Since the nature of the alleged employment arrangement between TeGrotenhuis and Technograph is a factual matter which is not sufficiently developed on the present record, a determination at this time of the date from which the statute should run would be premature.

Indeed, it is unclear at this point that TeGrotenhuis was even retained as an attorney by Technograph. Technograph argues that TeGrotenhuis' attendance at the Van-Waser deposition and at the hearing before the Master was due to the fact that he was a patent owner in this litigation,[32] and that TeGrotenhuis was never retained by Technograph to render the alleged legal services.[33] T & Z, however, allege that TeGrotenhuis has rendered continuous legal services since litigation began and that Technograph, through Bender, has requested TeGrotenhuis to perform legal services after the 1977 Agreement was entered into.[34] Thus, the facts are unclear as to whether there was an express or implied contract with TeGrotenhuis to render legal

---

**32.** As Technograph argues in its reply brief (Dkt. No. 752) at 18–19:

"The alleged services were mere attendance (i) at an earlier deposition and (ii) at the hearing before the Master (TB 25)—at which he told Mr. Bender that he 'felt like an outsider.' (Ex. II, *supra*). Although the hearing terminated on February 14, 1979, he did not submit the bill until January 18, 1983, almost 4 years later. He has told Mr. Bender (*Id.*) he 'never intended to submit any bills for services.' In June, 1979, he had agreed to accept a sum of money in settlement of alleged and disputed services, not claiming at that time that he was going to bill for attendance at the concluded hearing. When he testified in support of the plaintiff's claim against GM for attorneys' fees, he did not include these alleged services now claimed by him. (TB 26–27). His name never appeared as counsel on any of the accounting transcripts or briefs. (*Id.*). He did not sit at the counsel table except on one or two occasions. (*Id.*). Plaintiff's affidavit in support of that claim against GM did not include anything for those alleged services. (*Id.*).

All that Mr. TeGrotenhuis can say against all this is that his expenses were paid. But, of course, that was because he was a patent owner relying on the lawsuit to get money

into the Tech. Fund so he could receive his share of the purchase price."

**33.** Technograph's claim that TeGrotenhuis was not employed to render the alleged legal services is supported by the terms of the 1977 Agreement. Article 5 ("Attorneys") names the Blenko and Bender firms as attorneys and reserves to Technograph "the right to retain or employ additional attorneys." Article 5 makes no mention of TeGrotenhuis. *See* 1977 Agreement, Article 5, ¶ A, at 6–7, Exhibit A to Dkt. No. 691. Absent some action taken by Technograph after the 1977 Agreement was entered into to retain or employ TeGrotenhuis, it would appear that TeGrotenhuis' prior employment in this litigation would be terminated and not revived by the 1977 Agreement.

**34.** *See* T & Z's Answering Brief (Dkt. No. 746) at 31 ("Indeed, at least as recently as March 23, 1982, Mr. Bender personally submitted to TeGrotenhuis the first draft of a brief to the United States Supreme Court with the request, 'We would appreciate your suggested changes' (Exhibit B to TeGrotenhuis Affidavit)." Thus, T & Z apparently contend that, even if the 1977 Agreement effectively terminated TeGrotenhuis' prior employment as an attorney, TeGrotenhuis was later retained by Technograph to perform additional services.

services and as to whether his services were of a continuous nature. A hearing will be necessary to determine whether TeGrotenhuis was ever retained to render the alleged services and, if so, the extent and nature of the services rendered. Therefore, the Court denies Technograph's motion for summary judgment on Count Five of T & Z's complaint.

The parties are requested to submit an Order consistent with this Opinion.